Dawn C. Valdivia (SBN AZ 020715)
Zak A. Kuchler (SBN AZ 037965)
**STINSON LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone: 602.279.1600
Facsimile: 602.240.6925
dawn.valdivia@stinson.com
zak.kuchler@stinson.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Tactile Systems Technology, Inc. d/b/a Tactile Medical,<br><br>Plaintiff,<br><br>v.<br><br>Niku Asgari; Tatum Hutchings; Med-Advise Consulting, LLC,<br><br>Defendants. | Case No.<br><br>**VERIFIED COMPLAINT**<br><br>(Jury Trial Demanded) |

Plaintiff Tactile Systems Technology, Inc. d/b/a Tactile Medical ("Tactile" or "Plaintiff"), for its Verified Complaint ("Complaint") against Defendants Niku Asgari ("Asgari"), Tatum Hutchings ("Hutchings"), and Med-Advise Consulting, LLC ("Med Advise") (collectively, "Defendants;" Asgari and Hutchings, collectively, the "Individual Defendants"), hereby states and alleges as follows:

## <u>OVERVIEW OF THE ACTION</u>

1. This action seeks to stop, prevent, and remedy immediate, substantial, and irreparable harm sustained by Tactile as a result of former employees Niku Asgari and Tatum Hutchings' improper post-employment conduct which, at a minimum, violates their written Agreements, entered into as a condition of their at-will employment with Tactile.

2. Tactile develops, manufactures, markets, sells, pneumatic compression devices and related support services for the at-home treatment of lymphedema, lipedema, and chronic venous insufficiency. Its pneumatic compression devices reduce swelling, encourage lymph-

fluid flow, relieve discomfort, support mobility, reduce nonhealing venous ulcers, and enhance quality of life. Tactile's business depends on its relationships with medical facilities and clinicians, including physicians who serve as the bridge between Tactile's product and patients.

3. To protect these critical relationships and goodwill, Tactile requires its employees, including Asgari and Hutchings, to sign an Employee Confidentiality and Assignment of Inventions Agreement (each, an "Agreement," and collectively, the "Agreements") as a condition of their employment. The Agreements impose continuing confidentiality and nondisclosure duties, return-of-materials obligations, invention-assignment and post-employment disclosure obligations, and 12-month non-compete, non-hire, and non-solicitation covenants. They also provide for injunctive relief. True and correct copies of the Asgari Agreement and the Hutchings Agreement are attached to this Complaint as **Exhibits A** and **B**, respectively.

4. Tactile terminated Asgari and Hutchings on April 27, 2026, following an internal investigation into documentation-integrity issues.

5. Upon information and belief, Med Advise distributes lymphedema compression products, which involves sales associates going directly into medical facilities to market the product. This business overlaps directly with Tactile's pneumatic-compression-device business and patient and provider model.

6. After the terminations, Tactile learned that Hutchings was working for or with Med Advise in a same or similar customer-facing role in which she has been, directly or indirectly, soliciting, calling upon and/or taking away Tactile business to market the same type of products offered by Tactile. Upon information and belief, Asgari is also engaged in the same conduct with Med Advise.

7. Since Asgari and Hutchings' terminations, Tactile has lost business from at least fifteen clinics with which it previously built and maintained referral relationships. A number of these former referring clinics have explicitly stated that they no longer need Tactile's services because they are now being serviced by Med Advise through their relationships with Asgari and Hutchings. Since Asgari's and Hutchings's terminations, Tactile has suffered approximately a

30% reduction in average monthly referrals from clinics in Asgari's former territory and approximately a 41% reduction in average monthly referrals from clinics in Hutchings's former territory, representing an estimated loss of $145,000 in revenue per month.

8. Given the significant and immediate harm caused by Asgari and Hutchings's improper interactions with Tactile business and violation of their contractual covenants, Tactile is—and will continue to—experience unique and irreparable harm necessitating the entry of immediate temporary restraining order and other injunctive relief.

## PARTIES, JURISDICTION, AND VENUE

9. Tactile Systems Technology, Inc. d/b/a Tactile Medical ("Tactile") is a Delaware corporation with its principal place of business at 3701 Wayzata Blvd., Suite 300, Minneapolis, Minnesota 55416. Tactile is therefore a citizen of Delaware and Minnesota for purposes of 28 U.S.C. § 1332.

10. Asgari is a former Tactile employee who resides at 10363 E Sharon Dr., Scottsdale, Arizona 85260, which is in Maricopa County.

11. Hutchings is a former Tactile employee who resides at 8518 East Via De Sereno, Scottsdale, Arizona 85258, which is in Maricopa County.

12. Med Advise is a domestic, member-managed limited liability company registered with the Arizona Corporation Commission ("ACC"). The ACC record lists its principal office at 11823 N. 142nd St., Scottsdale, Arizona 85259, which is in Maricopa County. Upon information and belief, Med Advise has three members: The Benton Fam Rev Trust, Terri Benton, and Benton Biomedical Inc. The Benton Fam Rev Trust is located at 11823 N. 142nd Street, Scottsdale, AZ 85259. Terri Benton is an individual who, upon information and belief, resides at 11823 N. 142nd Street, Scottsdale, AZ 85259, which is in Maricopa County. Benton Biomedical Inc. is incorporated in Arizona and has its principal place of business at 11823 N. 142nd Street, Scottsdale, AZ 85259, which is in Maricopa County. None of Med Advise's members are citizens of Delaware or Minnesota, so Med Advise is not a citizen of Delaware or Minnesota.

13. Complete diversity exists under 28 U.S.C. § 1332(a)(1). Tactile is a citizen of Delaware and Minnesota. Asgari and Hutchings are citizens of Arizona. Med Advise is a citizen of Arizona because each of its members—the Benton Fam Rev Trust, Terri Benton, and Benton Biomedical Inc.—is a citizen of Arizona. No Defendant is a citizen of Delaware or Minnesota.

14. The amount in controversy exceeds $75,000, exclusive of interest and costs, based on the lost revenue and other damages caused by the loss or curtailment of business from referring clinics, the threatened loss of goodwill and confidential information, the equitable and specific-performance relief sought, and statutory remedies. This Court therefore has original subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).

15. Separately, this Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 because this Complaint asserts a federal claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. This Court has supplemental jurisdiction over Tactile's state-law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Tactile's federal claim under the Defend Trade Secrets Act and are so related to that claim that they form part of the same case or controversy under Article III of the United States Constitution.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). A substantial part of the events giving rise to Tactile's claims occurred in this District, including the Individual Defendants' post-employment competitive activities, their solicitation of Tactile's referring clinics, and Med Advise's engagement of the Individual Defendants in competing roles. Additionally, all Defendants reside in this District: Asgari and Hutchings reside in Scottsdale, Arizona, and Med Advise maintains its principal office at 11823 N. 142nd St., Scottsdale, Arizona 85259, and is subject to personal jurisdiction here. The Agreements contain Delaware governing-law provisions but no forum-selection clause.

## THE PARTIES' EMPLOYMENT RELATIONSHIPS AND DUTIES

17. Asgari began her employment at Tactile on or about August 18, 2022, in the position of Field Sales Support. Tactile most recently promoted Asgari to the position of Territory Account Manager on April 5, 2025—her last role before her termination on April 27, 2026.

18. Hutchings began her employment at Tactile on or about December 3, 2018, in the position of Associate Product Specialist. Tactile most recently promoted Hutchings to the position of Senior Territory Account Manager on April 1, 2022—her last role before her termination on April 27, 2026.

19. Both Asgari and Hutchings were high revenue generators who maintained deep relationships with referring clinics and providers.

20. As Territory Account Managers, Asgari and Hutchings' duties required them to visit clinics, develop and maintain relationships with physicians and clinic staff, present and educate providers about Tactile's devices and their appropriate use, and support product setup, reimbursement, and follow-up. Those relationships created a referral pathway: when a provider determined that a patient was an appropriate candidate, the provider could refer that patient for an appropriate Tactile device. Through those duties, Asgari and Hutchings had access to Tactile's products, operations, personnel, customers, suppliers, and confidential information about patients and their needs.

## TACTILE'S BUSINESS AND PROTECTABLE INTERESTS

21. Tactile provides at-home therapy solutions for lymphedema, lipedema, and chronic venous insufficiency. Its products include Nimbl, Flexitouch Plus, Entre Plus, and Kylee. Its pneumatic compression devices reduce swelling, encourage lymph-fluid flow, relieve discomfort, support mobility, reduce nonhealing venous ulcers, and enhance quality of life. Tactile's business includes those devices and the related patient and provider support that facilitates informed and consistent home use.

22. Tactile's care model includes pneumatic compression devices; a nationwide team of Territory Account Managers and Patient Education Consultants who provide personalized setup, training, and follow-up; reimbursement experts; patient advocates; and clinical staff. Tactile also partners with clinicians and health plans, works with thousands of third-party payers, and streamlines insurance and reimbursement processes.

**A. Customer Relationships and Goodwill**

23. Tactile builds customer and referral-source goodwill through sustained investment in its products, services, personnel, technical support, patient and provider education, training, reimbursement support, sales efforts, and other business resources. Those efforts develop and maintain relationships with referring clinics, clinicians, providers, patients, health plans, third-party payers, suppliers, contractors, and other business contacts.

24. During their employment with Tactile, Asgari and Hutchings marketed Tactile's products, educated providers, and developed and maintained clinic and provider relationships through Tactile's goodwill, resources, training, support, and substantial investment. Those relationships and related information were because of their employment with Tactile and developed for Tactile's business, not for their independent use on behalf of a competing business.

25. As Territory Account Managers, Asgari and Hutchings went into clinics, worked with physicians and clinic staff, educated providers about Tactile's devices, and supported provider referrals of appropriate products to patients. Asgari and Hutchings were high revenue generators with deep relationships among referring clinics and providers, and both Individual Defendants had access to nonpublic clinic, provider, patient-support, referral-source, reimbursement, product, company, and customer information.

26. Tactile's business depends on these clinic relationships because they are a direct referral pathway to providers and patients. Tactile's Territory Account Managers developed relationships with physicians and clinic staff and educated providers, who could then identify clinically appropriate patients and refer them for Tactile products. Without these relationships, Tactile loses its connection to its ultimate customer – the patients.

**B. Confidential and Proprietary Information**

27. Tactile's confidential and proprietary information includes nonpublic product and device designs, engineering and technical information, manufacturing and service processes, pricing and costs, business plans and strategies, clinic and referring-provider contact information, customer and supplier information, clinician, provider, patient-support, referral-source, health-plan, and third-party-payer information, product and patient education and

training materials, sales and marketing strategies, reimbursement workflows, patient-support and advocacy processes, employee and contractor information, patient-related information entrusted to Tactile or its customers, and other related business information. Through their customer-facing Tactile employment, Asgari and Hutchings had access to this information.

28. The Agreements require them to keep Company and Third Party Proprietary Information confidential and not use or disclose it without Tactile's written consent, subject to the Agreements' express terms. They also require them to return written, tangible, and electronic materials incorporating Company Proprietary Information or otherwise relating to Tactile's business upon termination. Tactile protects this information through the Agreements and the operational safeguards described above.

29. Defendants' retention, acquisition, use, or disclosure of Tactile's confidential information or trade secrets would give Med Advise or another competitor an unfair competitive advantage. That information could be used to target Tactile's clinics, referral sources, providers, patients, or payers or to replicate Tactile's product education, reimbursement, or patient-support processes. The concern is concrete because Med Advise appears to distribute BioCompression™ products and Tactile's clinic relationships have been affected. Tactile has retained the Tactile computer assigned to Hutchings and seeks targeted review to determine whether confidential clinic, patient, or other data were copied, retained, or transmitted. Tactile does not have complete access to the relevant devices, accounts, files, and communications and pleads these facts on information and belief pending discovery.

### C. Trade Secrets

30. Tactile's confidential and proprietary information includes trade secrets within the meaning of the Arizona Uniform Trade Secrets Act, A.R.S. §§ 44-401 to -407, and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. The trade secrets alleged here are specific compilations and combinations of non-public business information, not isolated facts that may be publicly available or readily ascertainable in isolation.

31. Tactile's trade secrets include, but are not limited to, specific compilations and combinations of non-public business data, including the combination of specific referring-

physician identities within particular clinics, those physicians' referral volume and patterns, provider preferences, pricing negotiated with specific payers, cost structures, reimbursement workflows tailored to specific clinic relationships, patient-support and advocacy processes, product education and training materials, customer and supplier lists, sales and marketing strategies, and related customer and business data. It is the particular compilation and combination of these elements—not any single clinic name, physician identity, pricing datum, or other fact viewed in isolation—that constitutes the asserted trade secret. Individual clinic names may be publicly known, but the compiled referral data, pricing, volume history, provider preferences, and internal workflow processes associated with those clinics are not publicly available or readily ascertainable by proper means. These compilations derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons—including competitors such as Med Advise—who can obtain economic value from their disclosure or use.

32. Tactile has taken reasonable efforts to maintain the secrecy of its trade secrets, including by requiring employees with access to such information to sign the Agreements, which impose continuing confidentiality and nondisclosure obligations; limiting access to confidential information on a need-to-know basis; maintaining password-protected electronic systems; and requiring the return of all materials incorporating Company Proprietary Information upon termination of employment.

33. Tactile's trade secrets are also related to products and services used in, and intended for use in, interstate and foreign commerce. Tactile is a Delaware corporation headquartered in Minnesota that develops, manufactures, markets, sells, and services its products nationwide through a team of Territory Account Managers and other personnel operating across the United States.

## THE EMPLOYEE CONFIDENTIALITY AND ASSIGNMENT OF INVENTIONS AGREEMENTS

34. Because Tactile's business depends on valuable clinic and provider relationships, the goodwill associated with those relationships, and confidential information developed through

its products, services, and patient- and provider-support model, Tactile required Asgari and Hutchings to sign Employee Confidentiality and Assignment of Inventions Agreements as conditions of employment. The Agreements protect Tactile's legitimate business interests by requiring the Individual Defendants to protect and not use Tactile's proprietary information, return Tactile materials, assign covered inventions, and observe defined post-employment restrictions.

35. Asgari signed an Employee Confidentiality and Assignment of Inventions Agreement on August 1, 2022, as a condition of her at-will employment. *See* **Exhibit A**.[1]

36. Hutchings signed an Employee Confidentiality and Assignment of Inventions Agreement on November 9, 2018, as a condition of her at-will employment. *See* **Exhibit B**.

### A. Confidentiality, Nondisclosure, Return, and Inventions

37. Sections 3 and 4 define Company and Third Party Proprietary Information to include nonpublic technical, financial, customer, business, product, development, sales, marketing, and related information with commercial value. The Agreements require Asgari and Hutchings, during and after employment, to keep that information confidential and not use or disclose it without Tactile's written consent, subject to the Agreements' express exceptions for generally known information and general skill, knowledge, know-how, and experience.

38. Section 5 requires the return, upon termination or Tactile's request, of all written and tangible materials and electronic or other intangible records in the employee's possession that incorporate Company Proprietary Information or otherwise relate to Tactile's business. Tactile seeks appropriate preservation, return, destruction, and written-confirmation relief.

39. Sections 6 through 13 assign Tactile covered inventions and related intellectual-property rights; require disclosure of prior, Company, and post-employment inventions within the Agreements' scope; and impose cooperation and related ownership obligations. Tactile seeks

[1] The first page of the Asgari Agreement bears a date of September 25, 2024. That date was automatically generated by Tactile's system when the document was downloaded and does not reflect the execution date or have any relevance to the Agreement itself. Asgari executed the Agreement on August 1, 2022, as confirmed by her electronic signature on Exhibit A, p. 5.

enforcement of those provisions for any invention, device, development, or disclosure within their scope.

**B. Restrictive Covenants**

40. Section 14 provides that a breach causes irreparable and continuing damage for which money damages are inadequate and entitles Tactile to injunctive relief, specific performance, and other appropriate relief, including monetary damages when appropriate.

41. Section 21 bars, during employment and for 12 consecutive months after termination, regardless of the reason for termination, directly or indirectly engaging in the United States or any other location in which Tactile is then doing business in the development, sale, service, or distribution of medical devices to treat lymphedema patients, subject to its express terms.

42. Sections 22 and 23 prohibit, during employment and for 12 consecutive months after termination, directly or indirectly hiring, engaging, or soliciting Tactile employees or contractors, including employees who worked for Tactile during the six months before termination, and soliciting, requesting, advising, or inducing any current or potential Tactile customer, supplier, or other business contact to cancel, curtail, or otherwise adversely change its relationship with Tactile.

**C. Reasonableness, Blue-Penciling, and Delaware Law**

43. Section 24 states that the restrictive covenants are reasonable and necessary to protect Tactile's legitimate interests and that violations cause substantial and irreparable harm not adequately remedied by money damages. Section 25 requires any restriction found overbroad to be construed to the maximum lawful extent within its express terms. Tactile seeks enforcement as written or, if necessary, lawful tailoring under those provisions.

44. Section 17 provides that each Agreement is governed by the laws of the United States and Delaware. Neither Agreement contains a forum-selection clause.

45. Each Agreement states that it is entered into in return for the employee's employment by Tactile. Thus, the employment relationship supplied consideration and seeks

enforcement of the Agreements' protections for its legitimate business interests under Delaware law.

**TERMINATION OF ASGARI AND HUTCHINGS**

46. Tactile terminated Asgari and Hutchings on April 27, 2026, following an internal investigation into documentation-integrity misconduct. Their terminations left the Agreements' post-employment obligations in effect, including confidentiality, return-of-materials, and 12-month restrictive covenants.

47. Tactile did not waive its rights by terminating Asgari and Hutchings. Notably, in connection with her departure, Hutchings sought a waiver of her non-compete. Tactile expressly declined to waive the restriction and told Hutchings that she was expected to comply with the Agreements. Tactile has not waived its rights or consented to any post-employment breach.

**ASGARI'S AND HUTCHINGS' POST-EMPLOYMENT ACTIVITIES IN VIOLATION OF THEIR AGREEMENTS**

48. After the April 27, 2026, terminations, Tactile learned that Hutchings and Asgari are working for or with Med Advise in roles that are in direct violation of their Agreements.

49. Upon information and belief, Hutchings and Asgari are now performing for Med Advise the same or similar referral clinic facing position they held while at Tactile.

50. In fact, Tactile has tangible evidence that Hutchings has been marketing lymphedema compression related devices to one of Tactile's former referring clinics. A Tactile employee observed competitor materials at the clinic, including a folder for the competing product offering with Hutchings's Med Advise business card attached. *See* **Exhibit C**. This clinic is one who Hutchings personally, materially, and regularly called upon and became acquainted with while she was employed with Tactile.

51. This observation is consistent with Tactile's understanding that Med Advise is distributing BioCompression™ products and that Hutchings is acting in a product-specialist or similar role directed toward clinics and providers with whom she serviced and developed relationships with while employed with Tactile. Tactile understands that Asgari is also working in this role.

52. Since Hutchings' and Asgari's terminations, Tactile has lost business from at least fifteen large referring clinics with which it previously built relationships and who, upon information and belief, are now working with Med Advise through Hutchings or Asgari.

53. Hutchings and Asgari's post-employment conduct for or with Med Advise represents significant breaches of the Agreements and threatens to continue breaching their contractual obligations.

54. Tactile is also legitimately and reasonably concerned about Hutchings and Asgari's likely and inevitable use, disclosure and employ of its confidential and other proprietary information to create unfair competitive advantage.

**MED ADVISE'S KNOWING PARTICIPATION AND COORDINATED CONDUCT**

55. Upon information and belief, Med Advise, Asgari, and Hutchings acted in concert and by agreement to misappropriate Tactile's trade secrets and confidential information, solicit Tactile's established clinic and provider relationships, and divert Tactile's business to Med Advise. The coordinated nature of their conduct is evidenced by, among other things, Med Advise's engagement of both Individual Defendants in the same customer-facing roles they held at Tactile, the provision of Med Advise marketing materials and business cards to the Individual Defendants for use at Tactile's former referring clinics, and the rapid and simultaneous loss of business from at least fifteen Tactile referring clinics—totaling an estimated $580,000 in lost revenue—following the Individual Defendants' terminations.

56. Upon information and belief, Med Advise knew that the Individual Defendants' knowledge of Tactile's clinics, providers, referral sources, pricing, reimbursement workflows, and patient-support processes was derived from their employment with Tactile and that such information constituted Tactile's trade secrets and confidential information. Med Advise accepted the benefit of that information and used it to target Tactile's established clinic relationships and gain an unfair competitive advantage.

57. Med Advise's conduct substantially assisted, encouraged, and facilitated the Individual Defendants' misappropriation of Tactile's trade secrets and confidential information, their breaches of the Agreements, and their solicitation of Tactile's customers and business

contacts. Med Advise provided the Individual Defendants with the platform, resources, marketing materials, and direction to carry out their competing activities using Tactile's proprietary information and relationships.

**HUTCHINGS AND ASGARI'S UNLAWFUL ACTIVITIES PRESENT A THREAT TO TACTILE'S PROTECTABLE INTERESTS**

58. Tactile's harm is already concrete. At least fifteen referring clinics with which Tactile previously developed relationships are now working with Med Advise, and Tactile has lost business from those clinics. During their employment, Asgari and Hutchings developed and maintained those relationships through Tactile's goodwill, resources, training, support, and substantial investment. Their duties included visiting clinics, working with physicians and clinic staff, educating providers about Tactile's devices, and supporting provider referrals of appropriate products to patients. The loss of business from those clinics therefore reflects present harm to Tactile's clinic-based referral relationships and goodwill.

59. Those facts also show a concrete risk of additional harm if the conduct continues. Med Advise's apparent distribution of BioCompression™ and other lymphedema-compression products, together with product-specialist or similar work by or involving the Individual Defendants, threatens to disrupt or redirect Tactile's clinic and provider relationships. Because providers often refer patients for appropriate Tactile devices through those relationships, continued disruption may cause additional lost referrals, revenue, and goodwill and may further impair Tactile's relationships with clinics, physicians, and clinic staff. A referral may be influenced or diverted before it becomes an identifiable lost order.

60. The continuing loss of referrals, goodwill, and confidential information cannot be fully remedied by money damages alone. Tactile faces immediate, substantial, and irreparable harm to its business because of Asgari's and Hutchings' breaches of their post employment agreements.

**TACTILE'S PRE-SUIT DEMAND AND NOTICE**

61. On July 29, 2026, Tactile's counsel sent a letter to Med Advise's owner, Chris Benton, notifying Med Advise of the Individual Defendants' post-employment obligations,

demanding written assurances of compliance by 5:00 p.m. CST on August 4, 2026, and demanding that any Tactile confidential information in Med Advise's possession be immediately returned.

62. A true and correct copy of the July 29, 2026, letter to Med Advise is attached as **Exhibit D**.

63. On the same date, Tactile's counsel sent demand letters to Asgari and Hutchings individually, reminding them of their contractual obligations, demanding assurances of compliance, and issuing litigation-hold notices.

64. To date, neither Med Advise, Asgari, nor Hutchings has provided the demanded assurances. An attorney has confirmed receipt on behalf of Med Advise, but no substantive response has been received from any Defendant.

**COUNT ONE: BREACH OF CONTRACT (ASGARI AND HUTCHINGS)**

65. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

66. Valid Agreements exist between Tactile and each of Asgari and Hutchings. The Asgari Agreement is attached as **Exhibit A** and the Hutchings Agreement is attached as **Exhibit B**.

67. The Agreements are valid and binding contracts between Tactile and Asgari and between Tactile and Hutchings.

68. The Agreements are supported by adequate consideration. Each was entered into as a condition of Asgari's or Hutchings's at-will employment with Tactile and states that it was entered into in return for her employment; Tactile provided that employment.

69. Sections 3 through 5 of each Agreement require Asgari and Hutchings to protect Company and Third-Party Proprietary Information, prohibit unauthorized use or disclosure, and return Tactile materials and records. Section 14 of each Agreement recognizes that a breach causes irreparable and continuing harm and permits injunctive relief, specific performance, and damages. Sections 21 through 23 of each Agreement impose, subject to their express terms, 12-month post-employment restrictions on competitive work, solicitation of Tactile employees or

contractors, and solicitation or inducement of Tactile customers, suppliers, and other business contacts. Those provisions are reasonable and necessary to protect Tactile's legitimate business interests, including its clinic, provider, referral-source, and customer relationships and associated goodwill, as well as its confidential and proprietary information, which Asgari and Hutchings accessed and developed through Tactile's resources and investment.

70. Because Asgari's and Hutchings's employment ended on April 27, 2026, and fewer than 12 months have passed, the post-employment restrictions remain in effect; Sections 3 through 5 of each Agreement also continue to impose confidentiality, non-use, and return-of-materials obligations.

71. Upon information and belief, Asgari and Hutchings are working for or with Med Advise in the same or similar referral-clinic-facing roles they held at Tactile and are performing product-specialist work involving BioCompression™, lymphedema-compression, or related medical devices. By engaging in competing work and directly or indirectly soliciting, calling upon, or taking away Tactile business through clinic and provider relationships developed at Tactile, Asgari and Hutchings have breached and threaten to continue breaching Sections 21 through 23 of their respective Agreements.

72. Upon information and belief, Asgari and Hutchings have also retained, used, disclosed, or made available Tactile's clinic, provider, patient-support, product, pricing, reimbursement, sales, or other confidential information in connection with Med Advise's competing activities, or threaten to do so. In addition, a Tactile employee observed competitor materials at a former referring clinic, including a folder for a competing product with Hutchings's Med Advise business card attached; Hutchings personally, materially, and regularly called upon that clinic while employed by Tactile. This evidence supports the inference that Hutchings solicited, called upon, or took away Tactile business through Tactile-developed relationships. (*See* Exhibit C.) Tactile lacks complete access to the relevant devices, accounts, files, and communications and therefore pleads the information-use allegations on information and belief pending discovery.

73. Since the Individual Defendants' terminations, Tactile has lost business from at least fifteen referring clinics, causing lost revenue—estimated to be more than $580,000 to date—and threatened loss of further referrals and goodwill.

74. Tactile has been irreparably injured and lacks an adequate remedy at law because clinic relationships are relationship-based referral channels whose disruption can divert referrals before they are identified or valued, and misuse or disclosure of confidential information and goodwill is difficult to quantify or reverse. Tactile is entitled to temporary, preliminary, and permanent injunctive relief, specific performance, and other equitable relief.

75. Tactile is likely to succeed on the merits because the Asgari Agreement and Hutchings Agreement are valid and binding, contain the express obligations described above, and the alleged conduct violates or threatens those obligations. The balance of hardships and equities favors enforcing the obligations Asgari and Hutchings undertook and preserving the status quo; the public interest favors protecting confidential information, fair competition, and reasonable contracts.

76. Tactile has suffered and will suffer actual damages, including lost business and revenue from affected clinics, lost or threatened future referrals, and harm to goodwill. Tactile seeks damages in an amount to be proved at trial, reasonable attorneys' fees and costs to the extent authorized by either Agreement or applicable law, and pre- and post-judgment interest as appropriate.

## COUNT TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ASGARI AND HUTCHINGS)

77. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

78. The Asgari Agreement and the Hutchings Agreement are valid and binding contracts governed by Delaware law, as described above.

79. Under Delaware law, every contract includes an implied covenant of good faith and fair dealing, which requires the parties to act consistently with the contract's purposes and the parties' reasonable expectations.

80. Even if the Court determines that certain of the Individual Defendants' post-employment conduct does not constitute a literal breach of the express terms of the Agreements, Asgari's and Hutchings's conduct violated the implied covenant by acting in a manner that frustrated Tactile's right to receive the benefits of the Agreements, including the protection of Tactile's confidential information, customer relationships, and goodwill.

81. Asgari's and Hutchings's conduct—including using knowledge and relationships acquired through their Tactile employment to compete with Tactile through Med Advise during the restricted period—deprived Tactile of the fruits of the Agreements in a manner that Asgari and Hutchings knew or should have known was inconsistent with the parties' reasonable expectations at the time of contracting.

82. As a direct and proximate result of Asgari's and Hutchings's breaches of the implied covenant, Tactile has suffered and will suffer damages, including lost business, lost revenue, lost referrals, and harm to goodwill, in an amount to be proved at trial.

**COUNT THREE: TORTIOUS INTERFERENCE WITH CONTRACT (MED ADVISE)**

83. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

84. The Asgari Agreement and the Hutchings Agreement are valid and enforceable contracts. Med Advise knew or had reason to know of the Agreements and their restrictive covenants before and no later than July 29, 2026.

85. Upon information and belief, given the direct competitive overlap between Med Advise's business and Tactile's business, and the senior customer-facing roles that Asgari and Hutchings held at Tactile, Med Advise knew or should have known at the time it engaged Asgari and Hutchings that they were likely subject to post-employment restrictive covenants. It is customary in the medical-device industry for territory account managers with access to confidential customer information and established referral relationships to be bound by non-competition, non-solicitation, and confidentiality agreements.

86. Med Advise's knowledge was confirmed on or about July 29, 2026, when Tactile's counsel expressly notified Med Advise of Asgari's and Hutchings' post-employment

obligations, identified the Agreements and their specific restrictions, and demanded written assurances of compliance by 5:00 p.m. CST on August 4, 2026.

87. Upon information and belief, Med Advise intentionally induced, encouraged, facilitated, or substantially assisted a breach of one or both Agreements by:

(a) engaging Asgari and Hutchings in product-specialist or similar customer-facing work involving BioCompression™, lymphedema compression, or related medical-device sales and support in direct competition with Tactile;

(b) specifically directing or assigning Asgari and Hutchings to service clinics and providers that Med Advise knew or should have known were Tactile's established referral sources, including clinics that Asgari and Hutchings had personally, materially, and regularly called upon while employed by Tactile;

(c) providing Asgari and Hutchings with marketing materials, business cards, and product information for use with those Tactile-developed clinic and provider relationships, as evidenced by the competitor materials and Hutchings's Med Advise business card observed at a former Tactile referring clinic (*see* **Exhibit C**);

(d) accepting the benefit of Tactile's confidential information, customer relationships, and clinic goodwill developed through Tactile's substantial investment; and

(e) continuing all of the foregoing conduct after receiving Tactile's July 29, 2026 demand letter and failing to substantively respond, provide assurances, or take any steps to ensure compliance.

88. Med Advise's conduct was a significant factor in causing the breaches of the Agreements and Tactile's resulting loss of business from at least fifteen referring clinics.

89. Med Advise's interference was intentional and improper and was undertaken without legal justification. Med Advise could have competed lawfully by hiring personnel not subject to restrictive covenants or by developing its own clinic relationships independently. Its conduct instead exploited Tactile's contractual protections and the substantial investment underlying those protections.

90. Med Advise's conduct was a significant factor in causing the breaches described in Count One and has injured Tactile through the diversion of business from affected referring clinics, loss of revenue, loss of referrals, and harm to goodwill.

**COUNT FOUR: MISAPPROPRIATION OF TRADE SECRETS UNDER THE ARIZONA UNIFORM TRADE SECRETS ACT (A.R.S. §§ 44-401 TO -407) (ALL DEFENDANTS)**

91. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

92. Tactile's confidential and proprietary information described herein includes trade secrets within the meaning of A.R.S. § 44-401(4). The trade secrets at issue are specifically the compiled, non-public datasets and workflows described above—including clinic-specific referral data, negotiated pricing and cost structures, proprietary reimbursement workflows tailored to specific clinic relationships, and patient-support processes—and not general business information or any individual fact that may be publicly known or independently ascertainable. Those compilations and workflows derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

93. Upon information and belief, Defendants have misappropriated Tactile's trade secrets within the meaning of A.R.S. § 44-401(2) by acquiring, disclosing, or using Tactile's trade secrets through improper means, including breach or inducement of a breach of a duty to maintain secrecy. Asgari and Hutchings acquired knowledge of Tactile's trade secrets during their employment under circumstances giving rise to a duty to maintain secrecy, and have used or disclosed that information without Tactile's consent in connection with their competing activities for or with Med Advise. Med Advise acquired or used Tactile's trade secrets knowing or having reason to know that such information was derived from persons who owed Tactile a duty to maintain its secrecy.

94. Defendants' misappropriation has caused and threatens to continue to cause injury to Tactile, including lost business from referring clinics, lost revenue, lost referrals, harm to goodwill, and loss of competitive advantage. Tactile is entitled to injunctive relief under A.R.S. § 44-402 to prevent actual and threatened misappropriation, damages for actual loss and unjust enrichment under A.R.S. § 44-403(A), exemplary damages of up to twice any award made under A.R.S. § 44-403(A) because Defendants' misappropriation was willful and malicious under A.R.S. § 44-403(B), and reasonable attorneys' fees under A.R.S. § 44-404.

## COUNT FIVE: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) (ALL DEFENDANTS)

95. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

96. Tactile's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce. Tactile is a Delaware corporation headquartered in Minnesota that develops, manufactures, markets, sells, and services its advanced pneumatic compression devices and related support services nationwide.

97. For purposes of this Count, the trade secrets at issue are specifically the compiled, non-public datasets and workflows described above—including clinic-specific referral data, negotiated pricing and cost structures, proprietary reimbursement workflows, and patient-support processes—as distinguished from general business information or isolated facts. Upon information and belief, Defendants have misappropriated Tactile's trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring, disclosing, or using Tactile's trade secrets by improper means, including breach or inducement of a breach of a duty to maintain secrecy, or by using or disclosing trade secrets without consent while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy.

98. Defendants' misappropriation has caused and threatens to continue to cause injury to Tactile, including lost business from referring clinics, lost revenue, lost referrals, harm to goodwill, and loss of competitive advantage.

99. Tactile is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A), damages for actual loss and unjust enrichment under 18 U.S.C. § 1836(b)(3)(B), exemplary damages of up to two times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(C) because Defendants' misappropriation was willful and malicious, reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), and such other relief as the Court deems appropriate, including ex parte seizure of property under 18 U.S.C. § 1836(b)(2) if necessary to prevent the propagation or dissemination of Tactile's trade secrets.

**COUNT SIX: COMMON-LAW MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (ALL DEFENDANTS)**

100. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

101. In addition to the compiled proprietary datasets and workflows alleged as trade secrets, Tactile possesses confidential and proprietary information that is commercially valuable and non-public but falls short of trade-secret status because it may be ascertainable through independent effort. Such information includes, but is not limited to, general clinic preferences, relationship-management approaches, internal process knowledge, and business practices developed through Tactile's substantial investment. This information is distinct from the specific compiled referral data, negotiated pricing, volume history, provider preferences, and clinic-tailored workflows that constitute Tactile's trade secrets.

102. Asgari and Hutchings obtained this confidential information during and by virtue of their employment with Tactile, under circumstances creating a duty to maintain its confidentiality. The Agreements expressly require them to keep Company and Third Party Proprietary Information confidential and not to use or disclose it without Tactile's written consent.

103. Defendants have engaged in unfair competition by misappropriating Tactile's non-trade-secret confidential information—including general information about Tactile's business model, clinic and provider relationships, general referral patterns, relationship-management approaches, internal operating and reimbursement practices, patient-support practices, and

competitive strengths—and exploiting that information and Tactile's customers to gain an unfair competitive advantage for Med Advise.

104. Defendants' unfair competitive conduct includes using Tactile's confidential information to target Tactile's established clinic and provider relationships, soliciting Tactile's referring clinics and business contacts, and diverting Tactile's business through the exploitation of information and relationships developed at Tactile's expense.

105. Med Advise has accepted the benefit of Tactile's confidential information knowing that it was derived from the Individual Defendants' employment with Tactile.

106. This common-law claim is not preempted by the Arizona Uniform Trade Secrets Act because it is based on confidential information that may not constitute a trade secret within the meaning of A.R.S. § 44-401(4). *See GlobalTranz Enters. Inc. v. Shipper's Choice Glob. LLC*, No. CV-16-04038-PHX-ROS, 2017 WL 11609546, at *7 (D. Ariz. Feb. 23, 2017) ("If the information allegedly misappropriated does not qualify as trade secrets, it qualifies as confidential and, therefore, can support an unfair competition claim").

107. Defendants' misappropriation of Tactile's confidential information has caused and threatens to continue to cause injury to Tactile. Tactile is entitled to injunctive relief and damages in an amount to be proved at trial.

**COUNT SEVEN: CIVIL CONSPIRACY (ALL DEFENDANTS)**

108. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

109. Upon information and belief, Defendants agreed and conspired among themselves to accomplish an unlawful purpose—namely, the misappropriation of Tactile's trade secrets and confidential information, the solicitation of Tactile's established clinic and provider relationships, and the diversion of Tactile's business to Med Advise—or to accomplish the lawful purpose of competing with Tactile by unlawful means, including the breach and inducement of breach of the Agreements and the misappropriation of Tactile's trade secrets and confidential information. The underlying torts supporting this civil-conspiracy claim include the tortious interference with contract alleged in Count Three, the misappropriation of trade secrets

alleged in Counts Four and Five, and the intentional interference with prospective economic advantage alleged in Count Ten.

110. In furtherance of the conspiracy, each Defendant committed overt acts, including those described above, which caused injury to Tactile. The ongoing conspiracy has resulted in the loss of business from at least fifteen referring clinics to date, lost revenue, harm to goodwill, and the misappropriation of Tactile's trade secrets and confidential information.

111. Each Defendant acted at least in part for its or their own personal purposes and independent interests, and not solely within the scope of a principal-agent or employer-employee relationship. Asgari and Hutchings brought to the arrangement their own independent personal interests, including their Tactile-developed clinic and provider relationships and their knowledge of Tactile's confidential information.

112. As a result of Defendants' conspiracy, Tactile has been injured and is entitled to damages, including compensatory damages, in an amount to be proved at trial, and such other relief as the Court deems just and proper.

## COUNT EIGHT: AIDING AND ABETTING (MED ADVISE)

113. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

114. The Individual Defendants committed tortious acts causing injury to Tactile, including misappropriation of trade secrets and misappropriation of confidential information, as described herein. The underlying torts supporting this aiding-and-abetting claim include the tortious interference with contract alleged in Count Three, the misappropriation of trade secrets alleged in Counts Four and Five, and the intentional interference with prospective economic advantage alleged in Count Ten.

115. Med Advise knew that the Individual Defendants' conduct constituted tortious activity. Med Advise knew or had reason to know that the Individual Defendants were bound by post-employment restrictive covenants and confidentiality obligations, that they possessed Tactile's trade secrets and confidential information, and that their competing activities for or with Med Advise involved the use or disclosure of that information. Med Advise's knowledge

was confirmed no later than July 29, 2026, when Tactile's counsel expressly notified Med Advise of the Individual Defendants' obligations.

116. Med Advise provided substantial assistance and encouragement to the Individual Defendants in committing their tortious acts by engaging them in competing customer-facing roles, providing them with marketing materials and business cards, directing or assigning them to service Tactile's established referral clinics, accepting the benefit of Tactile's trade secrets and confidential information, and continuing all such conduct after receiving Tactile's July 29, 2026 demand letter.

117. As a direct and proximate result of Med Advise's aiding and abetting, Tactile has been injured and is entitled to damages in an amount to be proved at trial.

**COUNT NINE: UNJUST ENRICHMENT (ALL DEFENDANTS)**

118. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

119. Tactile pleads this Count in the alternative to any contract-based claims to the extent necessary.

120. Defendants have been enriched at Tactile's expense by exploiting Tactile's trade secrets, confidential information, clinic and provider relationships, and goodwill—all of which were developed through Tactile's substantial investment in its products, services, personnel, and business operations.

121. Med Advise has received the benefit of Tactile's clinic relationships, referral sources, and confidential information through the Individual Defendants' competing activities, and has used those benefits to distribute BioCompression™ products and other lymphedema-compression devices through clinic channels that Tactile built and maintained.

122. Under the circumstances, it would be unjust and inequitable for Defendants to retain the benefits derived from Tactile's trade secrets, confidential information, and business relationships without compensating Tactile.

123. Tactile is entitled to disgorgement of Defendants' ill-gotten gains and such other relief as the Court deems just and proper. To the extent this claim is based on confidential information that does not constitute a trade secret, it is not preempted by AUTSA.

**COUNT TEN: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (ALL DEFENDANTS)**

124. Tactile re-alleges and incorporates by reference the allegations above as though fully set forth in this Count.

125. Tactile had valid and existing business relationships and expectancies with its referring clinics and providers, including ongoing and prospective referral relationships through which providers identify appropriate patients and refer them for Tactile products. These relationships and expectancies had economic value to Tactile and represented a reasonable likelihood of future economic benefit.

126. Defendants knew of Tactile's business relationships and expectancies with its referring clinics and providers. The Individual Defendants developed and maintained those relationships during their employment with Tactile, and Med Advise knew or had reason to know of them given the direct competitive overlap between its business and Tactile's.

127. Defendants intentionally and improperly interfered with Tactile's business relationships and expectancies by soliciting Tactile's referring clinics, diverting referral relationships to Med Advise, and using Tactile's confidential information and trade secrets to target and redirect Tactile's established clinic and provider relationships.

128. Defendants' interference was independently wrongful and improper. Specifically, (a) Med Advise's conduct constituted tortious interference with contract, as alleged in Count Three; (b) Defendants' conduct constituted misappropriation of Tactile's trade secrets in violation of AUTSA and the DTSA, as alleged in Counts Four and Five; and (c) the Individual Defendants breached known contractual duties under the Agreements, and Med Advise knowingly induced and facilitated those breaches. Each of these independently wrongful acts supplies the "improper conduct" element required under Arizona law. Defendants used Tactile's own trade secrets, confidential information, and clinic relationships—developed through

Tactile's substantial investment—to divert business that Tactile had a reasonable expectation of receiving. Med Advise could have competed lawfully by hiring personnel not subject to restrictive covenants or by developing its own clinic relationships independently.

129. As a direct and proximate result of Defendants' intentional interference, Tactile has lost business from at least fifteen referring clinics, suffered lost revenue and referrals, and experienced harm to its goodwill and provider relationships. Tactile is entitled to damages in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Tactile Systems Technology, Inc. d/b/a Tactile Medical respectfully prays for judgment in its favor and against Defendants that includes, but is not limited to:

(a) Issuing temporary, preliminary, and permanent injunctive relief against all Defendants and persons acting in concert with them who receive actual notice, under Fed. R. Civ. P. 65, to prevent violations of the Agreements and the misuse or disclosure of Tactile's information;

(b) Enforcing Sections 3, 4, 5, 14, and 21 through 23 of the Asgari Agreement, attached as **Exhibit A**, and the Hutchings Agreement, attached as **Exhibit B**, subject to any lawful tailoring required by Delaware law;

(c) Even more specifically and immediately, enjoining Asgari and Hutchings, temporarily, preliminarily, and permanently, from directly or indirectly:

(i) engaging in competitive work within the scope of Section 21, including developing, selling, servicing, or distributing medical devices to treat lymphedema patients or any similar competitive business, in the United States or in other locations where Tactile does business;

(ii) hiring, engaging, or soliciting Tactile employees or contractors within the scope and look-back period of Section 22, or soliciting, requesting, advising, or inducing current or potential Tactile customers, suppliers, or other business contacts to cancel, curtail, or adversely change their relationships with Tactile within the scope of Section 23;

(iii) acquiring, retaining, using, disclosing, transmitting, or permitting access to Tactile confidential, proprietary, or trade-secret information, and ordering the preservation and return of all Tactile information and property, including Tactile-issued computers and phones, company email and cloud accounts, clinic and patient-related records, product materials, and other files, together with written confirmation of compliance, subject to a reasonable protocol, privacy protections, and appropriate cost allocation;

(d) Ordering expedited discovery, including targeted document requests, depositions, interrogatories, preservation measures, and other discovery appropriate to determine the nature and scope of Defendants' post-employment competitive activities, identify which Tactile clinics have been solicited or serviced by Defendants, establish whether Tactile information was retained or used, and support Tactile's motion for preliminary injunctive relief;

(e) Awarding Tactile actual damages, lost profits, and lost revenue recoverable against the appropriate Defendants in an amount to be established at trial, including losses resulting from the loss or curtailment of business from affected referring clinics and the harm to Tactile's goodwill and referral relationships;

(f) Awarding Tactile damages for misappropriation of trade secrets under the Arizona Uniform Trade Secrets Act, A.R.S. §§ 44-401 to -407, including actual loss, unjust enrichment, and exemplary damages of up to twice any award for willful and malicious misappropriation under A.R.S. § 44-403;

(g) Awarding Tactile damages for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, including actual loss, unjust enrichment, and exemplary damages of up to two times the amount of damages awarded for willful and malicious misappropriation, and ordering *ex parte* seizure of property under 18 U.S.C. § 1836(b)(2) if necessary to prevent the propagation or dissemination of Tactile's trade secrets;

(h) Awarding Tactile disgorgement of Defendants' unjust enrichment and ill-gotten gains derived from the exploitation of Tactile's trade secrets, confidential information, and business relationships;

(i) Awarding Tactile damages against all Defendants, jointly and severally, for civil conspiracy, aiding and abetting, common-law misappropriation of confidential information, and intentional interference with prospective economic advantage in amounts to be proved at trial;

(j) Awarding Tactile reasonable attorneys' fees and costs, including but not limited to: (i) attorneys' fees authorized by Section 14 of the Agreements; (ii) attorneys' fees for willful and malicious misappropriation of trade secrets under the Arizona Uniform Trade Secrets Act, A.R.S. § 44-404; (iii) attorneys' fees for willful and malicious misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D); and (iv) attorneys' fees and costs to the extent otherwise authorized by applicable law, A.R.S. § 12-341.01 and 6 Del. C. § 2004, together with pre- and post-judgment interest to the extent appropriate;

(k) Awarding Tactile damages against Asgari and Hutchings for breach of the implied covenant of good faith and fair dealing, including compensatory damages in an amount to be proved at trial, to the extent the Court determines that their post-employment conduct frustrated Tactile's right to receive the benefits of the Agreements; and

(l) Awarding Tactile such other, further, or different relief as the Court deems just, equitable, and proper, including an extension of any covenant period where necessary to restore bargained-for protection and permitted by law.

## VERIFICATION

I, Janelle Strop declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint and that the factual allegations are true and correct to the best of my knowledge, information, and belief, except as to matters stated on information and belief, which I believe to be true. I am authorized to make this verification on behalf of Plaintiff.

Executed this 28th day of August 2026.

Janelle Strop , CHRO of Tactile Medical

Janelle Strop

RESPECTFULLY SUBMITTED this 31st day of August 2026.

**STINSON LLP**

By: *s/ Zak A. Kuchler*

Dawn C. Valdivia
Zak A. Kuchler
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004

*Attorneys for Plaintiff*

# Exhibit A

# Employee Confidentiality and Assignment of Inventions Agreement

This Employee Confidentiality and Assignment of Inventions Agreement, dated as of September 25, 2024, is intended to formalize in writing certain understandings and procedures which are and will be in effect during the time Niku Asgari ("**Employee**") is employed by Tactile Medical (the "**Company**"). In return for such employment by the Company, Employee and Company agree that:

1. At-Will Employment; No Conflict. Employee will perform for the Company such duties as may be designated by the Company from time to time. Employee agrees that Employee's employment with the Company is for no specified term, and may be terminated by the Company at any time, with or without cause, and with or without notice. Similarly, Employee may terminate employment with the Company at any time, with or without cause and with or without notice. During my period of employment by the Company, Employee will devote Employee's best efforts to the interests of the Company and will not engage in other employment or in any activities determined by the Company to be detrimental to the best interests of the Company without the prior written consent of the Company.
2. Prior Work. All previous work, if any, done by Employee for the Company relating in any way to the conception, design, development or support of products for the Company is the property of the Company.
3. Proprietary Information. Employee's employment creates a relationship of confidence and trust in the Employee for the benefit of the Company with respect to any information:
    a. Applicable to the business of the Company; or
    b. Applicable to the business of any client or customer of the Company, which may be disclosed to Employee by the Company or by any client or customer of the Company, or learned by Employee in such context during the period of Employee's employment.

   All of such information has commercial value in the business in which Company is engaged and is referred to as "**Company Proprietary Information**" in this Agreement. By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of Company, and includes, without limitation, its respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. "**Third Party Proprietary Information**" includes proprietary or confidential information of any third party who may disclose such information to Company or Employee in the course of Company's business.

4. Nondisclosure of Proprietary Information. All Company Proprietary Information is the sole property of the Company, its assigns, and the Company, its assigns and its customers will be the sole owner of all patents, copyrights, maskworks, trade secrets and other rights in connection therewith. Employee hereby assigns to the Company any rights Employee may have or acquire in such Company Proprietary Information. At all times, both during Employee's employment by the Company and after termination of such employment, Employee will keep in confidence and trust all Company and Third Party Proprietary Information, and Employee will not use or disclose any Company or Third Party Proprietary Information or anything directly relating to it without the written consent of the Company, except as may be necessary in the ordinary course of performing Employee's duties as an employee of the Company. Notwithstanding the foregoing, it is understood that, at all such times, Employee is free to use information which is generally known in the trade or industry not as a result of a breach of this Agreement. Outside of employment by the Company and after termination of employment with Company, Employee may use the general skill, knowledge, know-how and experience acquired

during employment with the Company, provided that such use (1) does not relate (a) directly to the business of the Company or (b) to the Company's actual or demonstrably anticipated research or development or (2) does not result from any work performed by Employee for the Company.

5. <u>Return of Materials.</u> Upon termination of Employee's employment or at the request of the Company before termination, Employee will deliver to the Company all written and tangible material and copies of all intangible records (e.g., in electronic form) in Employee's possession incorporating any Company Proprietary Information or otherwise relating to the Company's business.
6. <u>Inventions, Ideas, and Expressions of Ideas.</u> As used in this Agreement, the term "**Inventions, Ideas, and Expression of Ideas**" means any and all new or useful art, discovery, improvement, technical development, or invention whether or not patentable, and all related know-how, designs, maskworks, trademarks, formulae, processes, manufacturing techniques, trade secrets, ideas, artwork, software or other copyrightable or patentable works.
7. <u>Disclosure of Prior Inventions.</u> Employee has identified on <u>Exhibit A</u> all Inventions, Ideas, and Expressions of Ideas relating in any way to the Company's business or demonstrably anticipated research and development that were made by Employee prior to employment with the Company ("**Prior Inventions, Ideas, and Expressions of Ideas**"), and Employee represents that such list is complete. Employee represents that Employee has no rights in any such Inventions, Ideas, and Expressions of Ideas other than those Prior Inventions, Ideas, and Expressions of Ideas specified in <u>Exhibit A</u>. If there is no such list on <u>Exhibit A</u>, Employee represents that Employee has made no such Prior Inventions, Ideas, and Expressions of Ideas at the time of signing this Agreement.
8. <u>Ownership of Company Inventions; License of Prior Inventions.</u> Employee acknowledges that all original works of authorship that are made by Employee (solely or jointly with others) within the scope of employment and that are protectable by copyrights are "works made for hire" as that term is defined in the United States Copyright Act (17 USCA 101). Employee hereby agrees promptly to disclose and describe to the Company, and hereby assigns and agrees to assign to the Company or its designee, Employee's entire right, title, and interest in and to all Inventions, Ideas, and Expressions of Ideas and any associated intellectual property rights that Employee may solely or jointly conceive, develop or reduce to practice during the period of employment with the Company (a) that relate at the time of conception or reduction to practice of the invention to the Company's business or actual or demonstrably anticipated research or development, or (b) that were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or trade secret information, or (c) that resulted from any work Employee performed for the Company ("**Company Inventions**"). Employee agrees to grant the Company or its designees a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of distribution) to practice all applicable patent, copyright and other intellectual property rights relating to any Prior Inventions, Ideas, and Expressions of Ideas that Employee incorporates, or permits to be incorporated, in any Company Inventions. Notwithstanding the foregoing, Employee agrees that Employee will not incorporate, or permit to be incorporated, such Prior Inventions, Ideas, and Expressions of Ideas in any Company Inventions without Company's prior written consent.
9. <u>Future Inventions.</u> Employee recognizes that Company Inventions or Company Proprietary Information relating to Employee's activities while working for the Company and conceived or made by Employee, alone or with others, within one year after termination of employment may have been conceived in significant part while employed by the Company. Accordingly, Employee agrees that such post employment inventions and proprietary information will be presumed to have been conceived during employment with the Company and are to be assigned and are hereby assigned to the Company unless and until Employee has established the contrary.
10. <u>Cooperation in Perfecting Rights to Inventions.</u>
    a. Employee agree to perform, during and after employment, all acts deemed necessary or desirable by the Company to permit and assist it, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the

Inventions, Ideas, and Expressions of Ideas hereby assigned to the Company. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents, copyrights, maskworks or other legal proceedings.

b. In the event that the Company is unable for any reason to secure my signature to any document required to apply for or execute any patent, copyright, maskwork or other applications with respect to any Inventions, Ideas, and Expressions of Ideas (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agents and attorneys-in-fact to act for and on my behalf and instead of Employee, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, maskworks or other rights thereon with the same legal force and effect as if executed by Employee.

11. No Violation of Rights of Third Parties. Employee agrees that performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Employee prior to employment with the Company, and Employee will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement. Employee agrees not to enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

12. Survival. This Agreement (a) will survive Employee's employment by the Company, (b) does not in any way restrict Employee's right or the right of the Company to terminate Employee's employment at any time, for any reason or for no reason, (c) inures to the benefit of successors and assigns of the Company, and (d) is binding upon Employee's heirs and legal representatives.

13. Post-Employment Disclosure. Employee agrees to disclose promptly in writing to the Company all Inventions, Ideas, and Expressions of Ideas made or conceived by the Employee during the term of employment by the Company and for one year thereafter, whether or not Employee believes such Inventions, Ideas, and Expressions of Ideas are subject to this Agreement, to permit a determination by the Company as to whether or not the Inventions, Ideas, and Expressions of Ideas are the property of the Company.

14. Injunctive Relief. A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to the Company for which there will be no adequate remedy at law, and the Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

15. Notices. Any notice required or permitted by this Agreement must be in writing and must be delivered as follows with notice deemed given as indicated: (i) by personal delivery when delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by telecopy or facsimile transmission upon acknowledgement of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to Employee may be sent to the most recent address of Employee in the Company's records or such other address as Employee may specify in writing. Notices to the Company will be sent to the Company's Chief Executive Officer or to such other address as the Company may specify in writing.

16. Notice to Employee from Company Employer. This Agreement does not apply to an invention for which no equipment, supplies facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

17. Governing Law. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Delaware, as such laws are applied to

agreements entered into and to be performed entirely within Minnesota without regards to the conflict of laws provisions thereof.

18. Severability. Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired thereby.
19. Waiver. The waiver by the Company of a breach of any provision of this Agreement by Employee will not operate or be construed as a waiver of any other or subsequent breach by Employee.
20. Entire Agreement. This Agreement represents the entire understanding of the parties with respect to the subject matter of this Agreement and supersedes all previous understandings, written or This Agreement may be amended or modified only with the written consent of both Employee and the Company. No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.
21. Agreement Not to Compete. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, engage in any business, in the United States or in any other location in which the Company is then doing business, for the development, sale, service, or distribution of medical devices to treat lymphedema patients or any similar business that is competitive with the businesses of the Company or its affiliates, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise. Ownership by Employee, as a passive investment, of less than 2.5% of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this paragraph.
22. Agreement Not to Hire. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, hire, engage or solicit any person who is then an employee or contractor of the Company or who was an employee of the Company at any time during the six month period immediately preceding Employee's termination of employment, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise.
23. Agreement Not to Solicit. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, solicit, request, advise or induce any current or potential customer, supplier or other business contact of the Company to cancel, curtail or otherwise adversely change its relationship with the Company, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise.
24. Acknowledgment. Employee hereby acknowledges that the provisions of Sections 21, 22, 23 and 24 are reasonable and necessary to protect the legitimate interests of the Company and that any violation of these sections by Employee will cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.
25. Blue Pencil Doctrine. If the duration of, the scope of or any business activity covered by any provision of Sections 21, 22, 23 or 24 is in excess of what is determined to be valid and enforceable under applicable law, such provision will be construed to cover only that duration, scope or activity that is determined to be valid and enforceable. Employee hereby acknowledges that these sections will be given the construction that renders their provisions

valid and enforceable to the maximum extent, not exceeding their express terms, possible under applicable law.

The parties certify and acknowledge that they have carefully read all of the provisions of this Agreement and they understand and will fully and faithfully comply with such provisions.

Exhibit A

PRIOR INVENTIONS, IDEAS, AND EXPRESSIONS OF IDEAS

Niku Asgari

☑ **Employee Signature** Niku Asgari 8/1/2022 7:13 PM
(checking the checkbox above is equivalent to a handwritten signature)

# Exhibit B

# Employee Confidentiality and Assignment of Inventions Agreement

This Employee Confidentiality and Assignment of Inventions Agreement, dated as of , is intended to formalize in writing certain understandings and procedures which are and will be in effect during the time (“**Employee**”) is employed by Tactile Medical (the “**Company**”). In return for such employment by the Company, Employee and Company agree that:

1. At-Will Employment; No Conflict. Employee will perform for the Company such duties as may be designated by the Company from time to time. Employee agrees that Employee’s employment with the Company is for no specified term, and may be terminated by the Company at any time, with or without cause, and with or without notice. Similarly, Employee may terminate employment with the Company at any time, with or without cause and with or without notice. During my period of employment by the Company, Employee will devote Employee’s best efforts to the interests of the Company and will not engage in other employment or in any activities determined by the Company to be detrimental to the best interests of the Company without the prior written consent of the Company.
2. Prior Work. All previous work, if any, done by Employee for the Company relating in any way to the conception, design, development or support of products for the Company is the property of the Company.
3. Proprietary Information. Employee’s employment creates a relationship of confidence and trust in the Employee for the benefit of the Company with respect to any information:
    a. Applicable to the business of the Company; or
    b. Applicable to the business of any client or customer of the Company, which may be disclosed to Employee by the Company or by any client or customer of the Company, or learned by Employee in such context during the period of Employee’s employment.

   All of such information has commercial value in the business in which Company is engaged and is referred to as “**Company Proprietary Information**” in this Agreement. By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of Company, and includes, without limitation, its respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. “**Third Party Proprietary Information**” includes proprietary or confidential information of any third party who may disclose such information to Company or Employee in the course of Company’s business.

4. Nondisclosure of Proprietary Information. All Company Proprietary Information is the sole property of the Company, its assigns, and the Company, its assigns and its customers will be the sole owner of all patents, copyrights, maskworks, trade secrets and other rights in connection therewith. Employee hereby assigns to the Company any rights Employee may have or acquire in such Company Proprietary Information. At all times, both during Employee’s employment by the Company and after termination of such employment, Employee will keep in confidence and trust all Company and Third Party Proprietary Information, and Employee will not use or disclose any Company or Third Party Proprietary Information or anything directly relating to it without the written consent of the Company, except as may be necessary in the ordinary course of performing Employee’s duties as an employee of the Company. Notwithstanding the foregoing, it is understood that, at all such times, Employee is free to use information which is generally known in the trade or industry not as a result of a breach of this Agreement. Outside of employment by the Company and after termination of employment with Company, Employee may use the general skill, knowledge, know-how and experience acquired

Company, Employee may use the general skill, knowledge, know-how and experience acquired during employment with the Company, provided that such use (1) does not relate (a) directly to the business of the Company or (b) to the Company's actual or demonstrably anticipated research or development or (2) does not result from any work performed by Employee for the Company.

5. Return of Materials. Upon termination of Employee's employment or at the request of the Company before termination, Employee will deliver to the Company all written and tangible material and copies of all intangible records (e.g., in electronic form) in Employee's possession incorporating any Company Proprietary Information or otherwise relating to the Company's business.

6. Inventions, Ideas, and Expressions of Ideas. As used in this Agreement, the term "**Inventions, Ideas, and Expression of Ideas**" means any and all new or useful art, discovery, improvement, technical development, or invention whether or not patentable, and all related know-how, designs, maskworks, trademarks, formulae, processes, manufacturing techniques, trade secrets, ideas, artwork, software or other copyrightable or patentable works.

7. Disclosure of Prior Inventions. Employee has identified on Exhibit A all Inventions, Ideas, and Expressions of Ideas relating in any way to the Company's business or demonstrably anticipated research and development that were made by Employee prior to employment with the Company ("**Prior Inventions, Ideas, and Expressions of Ideas**"), and Employee represents that such list is complete. Employee represents that Employee has no rights in any such Inventions, Ideas, and Expressions of Ideas other than those Prior Inventions, Ideas, and Expressions of Ideas specified in Exhibit A. If there is no such list on Exhibit A, Employee represents that Employee has made no such Prior Inventions, Ideas, and Expressions of Ideas at the time of signing this Agreement.

8. Ownership of Company Inventions; License of Prior Inventions. Employee acknowledges that all original works of authorship that are made by Employee (solely or jointly with others) within the scope of employment and that are protectable by copyrights are "works made for hire" as that term is defined in the United States Copyright Act (17 USCA § 101). Employee hereby agrees promptly to disclose and describe to the Company, and hereby assigns and agrees to assign to the Company or its designee, Employee's entire right, title, and interest in and to all Inventions, Ideas, and Expressions of Ideas and any associated intellectual property rights that Employee may solely or jointly conceive, develop or reduce to practice during the period of employment with the Company (a) that relate at the time of conception or reduction to practice of the invention to the Company's business or actual or demonstrably anticipated research or development, or (b) that were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or trade secret information, or (c) that resulted from any work Employee performed for the Company ("**Company Inventions**"). Employee agrees to grant the Company or its designees a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of distribution) to practice all applicable patent, copyright and other intellectual property rights relating to any Prior Inventions, Ideas, and Expressions of Ideas that Employee incorporates, or permits to be incorporated, in any Company Inventions. Notwithstanding the foregoing, Employee agrees that Employee will not incorporate, or permit to be incorporated, such Prior Inventions, Ideas, and Expressions of Ideas in any Company Inventions without Company's prior written consent.

9. Future Inventions. Employee recognizes that Company Inventions or Company Proprietary Information relating to Employee's activities while working for the Company and conceived or made by Employee, alone or with others, within one year after termination of employment may have been conceived in significant part while employed by the Company. Accordingly, Employee agrees that such post employment inventions and proprietary information will be presumed to have been conceived during employment with the Company and are to be assigned and are hereby assigned to the Company unless and until Employee has established the contrary.

10. Cooperation in Perfecting Rights to Inventions.

(a) Employee agree to perform, during and after employment, all acts deemed necessary or desirable by the Company to permit and assist it, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Inventions, Ideas, and Expressions of Ideas hereby assigned to the Company. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents, copyrights, maskworks or other legal proceedings.

(b) In the event that the Company is unable for any reason to secure my signature to any document required to apply for or execute any patent, copyright, maskwork or other applications with respect to any Inventions, Ideas, and Expressions of Ideas (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agents and attorneys-in-fact to act for and on my behalf and instead of Employee, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, maskworks or other rights thereon with the same legal force and effect as if executed by Employee.

11. No Violation of Rights of Third Parties. Employee agrees that performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Employee prior to employment with the Company, and Employee will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or others. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement. Employee agrees not to enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

12. Survival. This Agreement (a) will survive Employee's employment by the Company, (b) does not in any way restrict Employee's right or the right of the Company to terminate Employee's employment at any time, for any reason or for no reason, (c) inures to the benefit of successors and assigns of the Company, and (d) is binding upon Employee's heirs and legal representatives.

13. Post-Employment Disclosure. Employee agrees to disclose promptly in writing to the Company all Inventions, Ideas, and Expressions of Ideas made or conceived by the Employee during the term of employment by the Company and for one year thereafter, whether or not Employee believes such Inventions, Ideas, and Expressions of Ideas are subject to this Agreement, to permit a determination by the Company as to whether or not the Inventions, Ideas, and Expressions of Ideas are the property of the Company.

14. Injunctive Relief. A breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to the Company for which there will be no adequate remedy at law, and the Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

15. Notices. Any notice required or permitted by this Agreement must be in writing and must be delivered as follows with notice deemed given as indicated: (i) by personal delivery when delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by telecopy or facsimile transmission upon acknowledgement of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to Employee may be sent to the most recent address of Employee in the Company's records or such other address as Employee may specify in writing. Notices to the Company will be sent to the Company's Chief Executive Officer or to such other address as the Company may specify in writing.

16. Notice to Employee from Company Employer. This Agreement does not apply to an invention for which no equipment, supplies facility or trade secret information of the employer was used

and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

17. Governing Law. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Delaware, as such laws are applied to agreements entered into and to be performed entirely within Minnesota without regards to the conflict of laws provisions thereof.

18. Severability. Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired thereby.

19. Waiver. The waiver by the Company of a breach of any provision of this Agreement by Employee will not operate or be construed as a waiver of any other or subsequent breach by Employee.

20. Entire Agreement. This Agreement represents the entire understanding of the parties with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral. This Agreement may be amended or modified only with the written consent of both Employee and the Company. No oral waiver, amendment or modification shall be effective under any circumstances whatsoever.

21. Agreement Not to Compete. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, engage in any business, in the United States or in any other location in which the Company is then doing business, for the development, sale, service, or distribution of medical devices to treat lymphedema patients or any similar business that is competitive with the businesses of the Company or its affiliates, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise. Ownership by Employee, as a passive investment, of less than 2.5% of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this paragraph.

22. Agreement Not to Hire. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, hire, engage or solicit any person who is then an employee or contractor of the Company or who was an employee of the Company at any time during the six month period immediately preceding Employee's termination of employment, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise.

23. Agreement Not to Solicit. During Employee's employment with the Company or any affiliates of the Company and for a period of 12 consecutive months from and after the termination of Employee's employment, whether such termination is with or without cause, or whether such termination is at the instance of Employee or the Company, Employee will not, directly or indirectly, solicit, request, advise or induce any current or potential customer, supplier or other business contact of the Company to cancel, curtail or otherwise adversely change its relationship with the Company, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise.

24. Acknowledgment. Employee hereby acknowledges that the provisions of Sections 21, 22, 23 and 24 are reasonable and necessary to protect the legitimate interests of the Company and that any

violation of these sections by Employee will cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.

25. Blue Pencil Doctrine. If the duration of, the scope of or any business activity covered by any provision of Sections 21, 22, 23 or 24 is in excess of what is determined to be valid and enforceable under applicable law, such provision will be construed to cover only that duration, scope or activity that is determined to be valid and enforceable. Employee hereby acknowledges that these sections will be given the construction that renders their provisions valid and enforceable to the maximum extent, not exceeding their express terms, possible under applicable law.

The parties certify and acknowledge that they have carefully read all of the provisions of this Agreement and they understand and will fully and faithfully comply with such provisions.

| | |
|---|---|
| **TACTILE MEDICAL** | **EMPLOYEE:** |
| By: Wendy Watt | By: [signature] |
| Wendy Watt<br>Human Resources Manager | Date: 11-9-18 |
| | Tatum Hutchings |

# Exhibit C


Tatum Hutchings
Med-Advise Consulting, LLC
Product Specialist
Cell: (480) 997-6320
Fax: 480-865-2756
Email: thutchings@med-advise.com
Website: www.Med-Advise.com
How to send a referral:
Email or fax: Patients face sheet, insurance and last 1-2 medical notes (if available)
Phone: 480-997-6320
Fax: 480-865-2756
Email: Thutchings@med-advise.com
Please text, email or call me with any questions. ☺
Bio Compression Systems' Garments
Available in a variety of sizes and styles including: over the shoulder, adjustable, custom and amputee.
Made of high quality nylon, able to be disinfected, and all hand sewn in our factory.
8 Chamber Arm & Shoulder
4 Chamber Arm
16 Chamber Elite Bilateral Bio Vest
BIO COMPRESSION SYSTEMS INC.
#1 in Compression Therapy
Chronic Venous Insufficiency (CVI)
Tatum Hutchings
Med-Advise Consulting, LLC
Product Specialist
Cell: (480) 997-6320
Fax: 480-865-2756
Email: thutchings@med-advise.com
Website: www.Med-Advise.com

# Exhibit D

STINSON

Nicole L. Faulkner
**PARTNER**
DIRECT: 612.335.1675
OFFICE: 612.335.1500
nicole.faulkner@stinson.com

July 29, 2026

**SENT VIA EMAIL**

Med-Advise, LLC
Attn: Chris Benton, Owner
info@med-advise.com

**Re: Notice of Tatum Hutchings' and Niku Asgari's Post-Employment Obligations to Tactile Medical**

Dear Mr. Benton:

This firm and the undersigned represent Tactile Systems Technology, Inc., d/b/a Tactile Medical ("Tactile" or the "Company"), the former employer of Tatum Hutchings and Niku Asgari. Please direct all future communications on this matter through me. If you are represented by counsel, please let me know and provide a copy of this letter to them.

Tactile has learned that Med-Advise, LLC ("Med-Advise") has hired, or is currently working with, two former Tactile employees, Ms. Hutchings and Ms. Asgari, each of whom remains within the restricted post-separation period under her respective agreement with Tactile.

We therefore write this letter to you for the following reasons:

1. To ensure that Med-Advise is aware of Ms. Hutchings' and Ms. Asgari's post-employment contractual obligations to Tactile under their respective Employee Confidentiality and Assignment of Inventions Agreements (each, an "Agreement," and collectively, the "Agreements")—both signed by Ms. Hutchings and Ms. Asgari;

2. To seek assurances that Med-Advise and Ms. Hutchings and Ms. Asgari have taken appropriate steps to ensure that each of them complies with the non-competition, non-hire, non-solicitation, and non-disclosure provisions contained in their Agreements, so that Tactile can protect its legitimate business interests; and

3. To notify you of Tactile's intent to preserve all rights to take any and all appropriate legal action if necessary to ensure the protection of its business, its customer and employee relationships, and its confidential, proprietary information, and to pursue any and all remedies—equitable and legal—including those under the Agreements and applicable law.

**I. Ms. Hutchings' and Ms. Asgari's Ongoing Contractual Obligations to Tactile.**

As a condition of their respective employment with Tactile, Ms. Hutchings and Ms. Asgari each agreed to certain restrictive covenants contained in their Agreements. Among other things, each Agreement's non-competition provision prohibits the employee from, directly or indirectly, engaging in any business, in the United States or in any other location in which Tactile is then doing business, for the development, sale, service, or distribution of medical devices to treat lymphedema patients, or any similar business that is competitive with Tactile's business, for a period of twelve (12) consecutive months following the termination of their employment with Tactile.

For that same twelve-month period, each Agreement also prohibits the employee from, directly or indirectly, (i) hiring, engaging, or soliciting any person who is or was an employee or contractor of Tactile during the relevant look-back period, and (ii) soliciting, requesting, advising, or inducing any current or potential customer, supplier, or other business contact of Tactile to cancel, curtail, or otherwise adversely change its relationship with Tactile. Each Agreement further prohibits the use or disclosure of Tactile's confidential and proprietary information, both during and after employment with Tactile.

It is our understanding that Med-Advise is a business whose products, services, or activities compete with Tactile, and that employment of Ms. Hutchings and/or Ms. Asgari by Med-Advise in a role related to that competing business would require each of them to engage in activity prohibited by her Agreement. To the extent that Med-Advise recruited, hired, or otherwise engaged either individual with knowledge of her restrictive covenants, Tactile has concerns regarding potential interference with those contractual obligations as well.

If Med-Advise intends to continue employing or engaging Ms. Hutchings and/or Ms. Asgari, Tactile demands that Med-Advise provide us in writing by **5:00 p.m. CST on Tuesday, August 4, 2026**: (1) each individual's actual job title with Med-Advise; (2) a description of each individual's job duties; and (3) what steps Med-Advise and each individual have taken to ensure compliance with the non-competition, non-hire, and non-solicitation provisions contained in her Agreement. If Med-Advise fails to comply, Tactile will assume that means the employment of Ms. Hutchings and/or Ms. Asgari with Med-Advise violates one or more of their obligations under her Agreement.

Additionally, if Med-Advise is already in possession, custody, or control of any of Tactile's confidential or proprietary information or other business documents, Tactile demands that such materials immediately be returned to the undersigned and then be destroyed without retaining any copies.

**II. Preservation of Rights.**

Tactile expressly reserves all rights to take any and all appropriate legal action if necessary to ensure the protection of its business, its customer and employee relationships, and its confidential, proprietary information, and to pursue any and all remedies—equitable and legal—including those under the Agreements and applicable law. Tactile continues to review information relevant to this matter and expressly reserves the right to update its demands based on that review.

Please respond by **5:00 p.m. CST on Tuesday, August 4, 2026**. If you are represented by counsel, I expect to hear from them before this deadline.

Sincerely,

**Stinson LLP**



Nicole L. Faulkner

NLF:mp